**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHAMEEKIA ALLEN,<br><br>             **Plaintiff,**<br><br>  **- against -**<br><br>**UNITED CEREBRAL PALSY OF NEW YORK CITY and LOUELLA PURKETT,**<br><br>             **Defendants.** | **Case No. 11 CV 8057 (CM)(KNF)**<br><br>**AFFIDAVIT OF LOUELLA PURKETT IN SUPPORT OF DEFENDANTS' MOTION FOR <u>PARTIAL SUMMARY JUDGMENT</u>** |

LOUELLA PURKETT, being duly sworn, deposes and says:

1.      I am a named defendant in this action.  I submit this declaration in support of the Defendants' motion for partial summary judgment based on personal knowledge of the facts surrounding UCP's employment of the Plaintiff, Shameekia Allen, the termination of her employment on September 15, 2010, and her performance while employed.

2.      I am currently employed by United Cerebral Palsy of New York City, Inc. ("UCP") as a Program Director at UCP's Day Habilitation program in Brooklyn, New York.  I have held this position since May 2012.

3.      Prior to assuming that position, I was Program Director for various UCP Residential Services programs on Staten Island.  I held that position from June 2002 to May 2012.  From July 2010 to May 2012, I was responsible for the overall supervision of the Castleton residence where Ms. Allen worked at the time of her termination.

4.      UCP is a not-for-profit corporation that provides services to individuals with cerebral palsy and other developmental disabilities in New York City.  UCP's residential services program provides 24-hour care to developmentally disabled adults in a residential

setting. The individuals receiving care in the residential services program are commonly referred to as "consumers".

5.  UCP's residential services program is regulated by the New York State Office for People with Developmental Disabilities (OPWDD).

6.  The Castleton residence consists of eight apartments housing 17 consumers. The apartments are located on Staten Island. When I was Program Director, I was responsible for the day-to-day operations of the UCP residential program at these locations.

7.  Each residence is staffed by Residence Program Specialists ("RPS") who provide direct care to the consumers who reside there. The RPS's attend to the daily needs of the consumers including bathing, feeding, laundry, etc. The RPS employees are also responsible for complying with the individual care plans that are maintained for each consumer at UCP. The RPS's report directly to the Residence Manager of the residence in which they are working. The Residence Manager reports to the Assistant Program Director who, in turn, reported to me.

8.  Shameekia Allen, the plaintiff in this case, was hired by UCP on June 11, 2009 as an on-call Residence Program Specialist (RPS). Ms. Allen worked in UCP's residential services program, which provides services to adults with developmental disabilities. As an on-call employee, Ms. Allen worked on an as needed basis.

9.  At the commencement of Ms. Allen's employment with UCP, Ms. Allen received a copy of UCP's policy prohibiting discrimination and harassment, and attended the agency's new hire orientation. A copy of the discrimination and harassment policy, which Ms. Allen signed, is attached as Exhibit A.

10.  Ms. Allen remained an on-call employee until June 7, 2010, when she applied for and received a regular, part-time RPS position that had become available at that time.

11.     As a regular, part-time RPS, Ms. Allen's terms and conditions of employment were governed generally by the collective bargaining agreement (the "CBA") between UCP and the United Federation of Teachers, NYSUT, AFT, AFL-CIO (the "Union").  A copy of the Collective Bargaining Agreement is attached as Exhibit B.

12.     Pursuant to the CBA, Ms. Allen was subject to a six-month probationary period upon her transfer to a regular, part-time position.  During that timeframe, she could be terminated and had no right to challenge her termination through the arbitration procedure contained in the CBA.

13.     At the time of her termination during her probationary period on September 15, 2010, Ms. Allen regularly worked in Apartment 4J at the Castleton location, caring for NN (initials), a female consumer who resides in that apartment.  NN was the only consumer residing in that apartment and, on days she worked, Ms. Allen was the only staff member assigned to Apartment 4J.

14.     NN is a female who is approximately 55 years of age.  NN is mildly mentally retarded and suffers from generalized anxiety disorder, which manifests itself in NN crying, expressing anger or displaying a worried affect disproportionate to the current situation or trigger.  NN is the only consumer who resides in Apartment 4J.

15.     Ms. Allen reported directly to Lisa Quinones, a Residence Manager at the Castleton site.  Ms. Quinones reported directly to Maria Trantino, the Assistant Program Director at the Castleton site.  Ms. Trantino reported directly to me.   As an RPS, Ms. Allen's principal job function was to assist UCP's consumers at the Castleton location with their daily activities and needs in accordance with New York State regulations and UCP policies. Ms. Allen was also responsible for complying with the individual care plans that were maintained for the consumers

to whom she was assigned. A copy of Ms. Allen's signed RPS Job Description is attached as Exhibit C.

16. Throughout her employment, Ms. Allen exhibited troubling behaviors, including argumentativeness and insubordinate behavior toward myself and other supervisors. She often engaged in these behaviors in the presence of NN and other consumers and staff. Over time, I came to believe that Ms. Allen's behaviors were detrimental to the best interests and welfare of NN.

17. Shortly after I started working at the Castleton site in July 2010, Ms. Allen informed me that another staff member was leaving her shift early, thereby creating problems for staff that remained. Based on reports I received from others, this was not an isolated problem. During my first staff meeting at Castleton, I addressed the situation by stating that it was unacceptable for staff to leave their shift without permission, I explained that it created an undue burden on other staff and was unfair. At that point, I asked Ms. Allen how it made her feel when other staff left early. My intention was not to single Ms. Allen out or to inform staff that Ms. Allen had been the source of any information I had received. I simply chose her randomly in an attempt to solicit feedback at the meeting. However, Ms. Allen became visibly angry and accused me of singling her out. I apologized to her, but she refused to accept my apology. My relationship with Ms. Allen did not improve after this incident and I always sensed that she was hostile to me as well as other management staff.

18. In July 2010, shortly after I assumed oversight of the Castleton location, Ms. Allen accompanied NN to a birthday celebration hosted by NN's legal guardian, AHRC, a social services agency that provides care and guardianship services for the developmentally disabled. Representatives of AHRC called me on July 9, 2010, to report that Ms. Allen had been

unpleasant during NN's birthday party. Specifically, they reported that Ms. Allen behaved in an anti-social manner, sitting in the corner with her arms crossed and behaving as if she was annoyed to be there. The AHRC representatives also reported that they were concerned that Ms. Allen's negative attitude had an adverse effect on NN's mood and demeanor.

19. At the time I received this report from AHRC, I had only been Program Director at the Castleton site for a few weeks.

20. I spoke with Ms. Allen, who denied having done anything wrong. Ms. Allen claimed instead that the employees at AHRC did not like her and had complained about her in the past. I advised Ms. Allen that it was not acceptable to have a guardian complaining about services provided to a consumer by UCP staff and that I expected of all her interactions with NN and NN's guardian to be positive.

21. After receiving the AHRC report, I began to watch Ms. Allen more closely. I often observed Ms. Allen rolling her eyes and/or groaning audibly when NN made decisions with which Ms. Allen disagreed, such as where to go grocery shopping or for recreational activities.

22. I also observed Ms. Allen act disrespectfully toward me and other supervisors whenever we spoke to her about her performance or conduct. Again, she would routinely roll her eyes, or simply walk away without responding to me or the other supervisors.

23. In July, I observed that Ms. Allen, rather than waiting outside the Castleton residence for a bus to drop NN off from her educational program, would wait inside another apartment, from which she could look out the window and observe when the bus arrived. One day in July, I asked Ms. Allen to stop waiting for the bus inside the other apartment because other consumers resided in the apartment, and I did not feel it was appropriate for Ms. Allen

(who did not work in this apartment) to be there. So I asked Ms. Allen to wait outside for NN at NN's designated arrival time.

24.     The next day, NN came to my office and complained that Ms. Allen shouldn't have to wait outside for her.  It was apparent to me that Ms. Allen had inappropriately shared with NN the substance of her discussion with me and that she had manipulated NN to complain on her behalf.  I was extremely disturbed by this, as I felt it was entirely inappropriate for Ms. Allen to inform NN of directives issued by management to staff that involved NN's care.

25.     I spoke with Ms. Allen about all of these issues and advised her that her behavior was not acceptable.

26.     On another occasion, on July 17, 2010, Ms. Allen took NN into Manhattan via public transportation without first alerting me or any other member of the management team where she was going.  I spoke to Ms. Allen about this issue as well.   A copy of the verbal warning form memorializing this incident and my discussion with Ms. Allen is attached as Exhibit D.

27.     On August 19, 2010, when working at the Castleton site, I entered Castleton Apartment 2C and observed Ms. Allen, who was <u>not</u> assigned to work at that apartment at that time, speaking with another staff member who was on duty.  From what I could hear of the conversation it sounded as if Ms. Allen was speaking about other staff in a negative way.  This was particularly troubling to me since the consumers who resided in that apartment were present and able to hear the conversation. When I asked Ms. Allen to leave the apartment to speak with me privately, Ms. Allen refused and became visibly agitated, crossing her arms and simply refusing to acknowledge me.  I issued Ms. Allen a verbal warning for insubordination in

connection with this incident. A copy of a memorandum I prepared memorializing the verbal warning is attached as Exhibit E.

28. On September 9, 2010, the Assistant Program Director, Ms. Trantino also overheard Ms. Allen speaking disparagingly about Castleton management in front of a consumer. When questioned by Ms. Trantino, Ms. Allen rolled her eyes and walked away. Ms. Trantino issued Ms. Allen a written warning for insubordination in connection with this incident. A copy of a memorandum prepared by Ms. Trantino memorializing this incident is attached as Exhibit F.

29. After the September 9 incident, I contacted Alan Seiler, UCP's Director of Human Resources, to discuss Ms. Allen's insubordinate behavior, as well as what I perceived to be her negative attitude and influence on NN. Based on these issues, I recommended that Ms. Allen's employment be terminated.

30. My recommendation was based on Ms. Allen's entire employment history and my own experiences with her as described above. In this regard, I had by this time learned that Ms. Allen had been the subject of a serious disciplinary action in November 2009 while an on-call staff member prior to my taking over as Program Director at Castleton. During this incident, Ms. Allen had engaged in hostile behavior and threatened a nurse at a community hospital while engaged in her UCP work duties. A copy of the written warning that Ms. Allen received for this incident is attached as Exhibit G.

31. Upon reviewing Ms. Allen's entire employment history at UCP, including all of the incidents described above, Alan Seiler, UCP's Director of Human Resources, agreed it would not be in the interests of UCP and its consumers to continue Ms. Allen's employment and that it made sense to sever the relationship before Ms. Allen completed probation. Accordingly, Ms. Allen's employment was terminated on September 15, 2010. A copy of the Employee

Separation Record documenting Ms. Allen's termination is attached as Exhibit H. A copy of the letter dated September 15, 2010 sent to Ms. Allen confirming the termination of her employment is attached as Exhibit I.

32. I am aware that Ms. Allen claims her employment was terminated in part because of her race and that I am biased against African-Americans. At the time Plaintiff worked at the Castleton residence, UCP employed approximately 40-50 employees at that location. It bears mentioning that more than 80% of the staff at the Castleton IRA is black. I have hired African-American employees to management positions in the Residential Services programs on Staten Island, including Felicia Shields, who is the Assistant Program Director at the Castleton residence. Dahlian Porter, UCP's Director of Residential Services and the individual to whom I reported, is African American. To my knowledge, I have never been accused of racial discrimination, or any other kind of discrimination, before Ms. Allen's claims against me.

33. I am aware that Ms. Allen has also claimed that her employment was terminated because she complained to management that I made a racial remark about her. Ms. Allen's allegation against me is false and I so advised UCP management when I was questioned regarding Ms. Allen's complaint.

34. I did not consider Ms. Allen's race or her complaint about me when making any decision with respect to her employment, including the decision to recommend the termination of her employment in September 2010. To the contrary, my decision was based solely on lawful considerations, namely Ms. Allen's poor conduct and performance.

_LOUELLA PURKETT_

Sworn before me this 3rd day
of October, 2012

Notary Public

**AL DIAZ**
**Notary Public - State of New York**
**No. 01DI6208158**
**Qualified in Kings County**
**My Comm. Expires June 22, 2013**

# Exhibit A



# MEMORANDUM

United Cerebral Palsy
of New York City

80 Maiden Lane
8th Floor
New York, NY
10038-4811

tel 212 685 6700
fax 212 685 8394
www.ucpnyc.org

**To:** All Employees

**From:** Don Gerrish
Associate Executive Director

**Date:** December 18, 2001

**Re:** Administrative Memorandum, Human Resources 1-94 (Updated 12/01)
Harassment and Sexual Harassment Policy Statement

United Cerebral Palsy of New York City, Inc. is strongly committed to imparting a deep sense of respect for the dignity and integrity of each of our employee and program participants. It is the agency's policy to maintain an environment in which individuals may develop and grow, without being limited by or subject to any type of harassment or discrimination.

The agency is committed to a work environment that is free of unlawful discriminatory treatment and/or harassment based on an individual's race, color, ancestry, religion, gender, national origin, age, physical or mental disability, citizenship status, marital status, sexual orientation, veterans' status or any other classification protected by federal, state or local law. Improper harassment means unwelcome conduct whether verbal, physical or visual that affects tangible job benefits, interferes unreasonably with an individual's work performance and/or creates an intimidation, hostile or offensive working environment. No form of discriminatory treatment and/or improper harassment of our employees by anyone, including managers, supervisors, co-employees, or non-employees will be tolerated by the agency.

Although discrimination can involve conduct related to several areas (such as race, disability or religion), one particular area that deserves special mention is sexual harassment. United Cerebral Palsy of New York City, Inc. prohibits sexual harassment of its employees, non-employees, program participants, visitors or any other individuals related to the agency. Sexually harassing conduct in the workplace, whether physical or verbal, committed by supervisors or non- supervisory personnel, is against the law, against agency policy and will not be tolerated. Men as well as women can be victims of sexual harassment.

Unwelcome sexual advances, requests for sexual favors and other physical, verbal or visual conduct based on sex constitute sexual harassment when 1) submission to the conduct is an explicit or implicit term or condition of employment; 2) submission to or rejection of the conduct is used as the basis for an employment decision; or 3) the conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an

UCP000029

intimidating, hostile, or offensive working environment. Furthermore, no employee shall engage in any conduct, such as unwelcome sexual comments or innuendo, unwelcome touching or physical contact, sexually oriented joking, foul or obscene gestures, advances or propositions, or physical or verbal abuse, which creates a hostile work environment.

Any employee of the agency who believes that he/she has been the subject of sexual harassment should report the matter immediately to a supervisor or another member of management who shall be obligated to immediately notify the Director, Human Resources. If reporting alleged harassment complaints to the supervisor is not appropriate, the employee must report such complaint to one of the Assistant Executive Directors or the Director, Human Resources. All such matter will be handled in a confidential manner and information on the claim will be given only to those with a "need to know." A thorough investigation of all claims will be conducted. The agency will make every effort to ensure that complaints of sexual harassment are resolved promptly, affectively and ensure that such action or conduct will not recur again. No employee will suffer any adverse employment action as a result of reporting a claim of alleged sexual harassment. Any supervisor, or any other employee who is found after an investigation to have engaged in sexual harassment will be subject to appropriate disciplinary action, up to and including discharge.

I have read, understand, and will adhere to this policy.

Employee Name (Please Print)      Employee Signature                              Date

**Exhibit B**

COLLECTIVE BARGAINING AGREEMENT

Between

UNITED FEDERATION OF TEACHERS
LOCAL 2, AFT, NYSUT, AFL-CIO

And

UNITED CEREBRAL PALSY OF NYC,
RESIDENCES

FOR THE PERIOD

December 30, 2009 – June 29, 2012

CONFIDENTIAL

# Table of Contents

Page

| | | |
|---|---|---|
| Article 1 | Recognition | 1 |
| Article 2 | No Discrimination | 1 |
| Article 3 | Effective Date and Duration | 1 |
| Article 4 | Probationary Period | 1 |
| Article 5 | Seniority | 2 |
| Article 6 | Union Security | 3 |
| | A. Union Shop | 3 |
| | B. Payroll Deduction of Union Dues | 4 |
| | C. Employer Held Harmless | 4 |
| | D. Union Rights | 4 |
| | E. New Unit Employee | 5 |
| | F. Notification of Change of Status | 5 |
| Article 7 | Rates of Pay, Minimums, and Health Care Supplements | 5 |
| | A. Rates of Pay | 5 |
| | B. Health Care Supplements | 6 |
| | C. Re-opener | 7 |
| Article 8 | Pension Plan | 7 |
| Article 9 | Health and Dental Benefits | 8 |
| Article 10 | Vacations | 8 |
| Article 11 | Holiday Leave | 9 |
| Article 12 | Request to Use Accrued Holiday Leave or Vacation | 10 |
| Article 13 | Personal Days | 11 |
| Article 14 | Sick Leave | 11 |
| Article 15 | Leaves of Absence | 12 |
| | A. Bereavement Leave | 12 |
| | B. Jury Duty | 12 |
| | C. Military Leave | 13 |
| | D. Short-Term Disability Leave | 13 |
| | E. Family and Medical Leave | 13 |
| | F. Workers Compensation | 13 |
| | G. Leave Without Pay | 13 |
| Article 16 | Voluntary Benefits | 15 |
| Article 17 | Tuition Assistance | 15 |
| Article 18 | Employee Referral Program | 15 |
| Article 19 | Administration of Medication | 15 |
| Article 20 | Driving of Agency Vans | 16 |
| Article 21 | Fingerprinting and Employee ID Cards | 16 |
| Article 22 | Employee Expenses and Reimbursement | 16 |

| | | |
|---|---|---|
| Article 23 | Training of Employees | 16 |
| Article 24 | Past Practices | 17 |
| Article 25 | Hours of Work | 17 |
| | A. Regular Work Day and Work Week | 17 |
| | B. Timekeeping | 17 |
| | C. Overtime | 18 |
| | D. Training and Staff Meetings | 18 |
| Article 26 | Overnight Trips | 18 |
| Article 27 | Vacancies, Transfers, Promotions, Layoffs And Recalls | 18 |
| | A. Posting Vacancies | 18 |
| | B. Voluntary Transfers and Promotions | 19 |
| | C. Layoffs and Recalls | 19 |
| | D. Transfers Within the Unit | 20 |
| | E. Transfers Out of the Unit | 20 |
| | F. Disputes | 20 |
| Article 28 | Due Process | 20 |
| | A. Disciplinary Interviews | 20 |
| | B. Discipline and Discharge | 21 |
| | C. Employee Investigations | 21 |
| Article 29 | Grievance and Arbitration Procedure | 21 |
| | A. Definition | 21 |
| | B. Informal Resolution | 21 |
| | C. Formal Grievance Procedures | 21 |
| | D. Arbitration | 22 |
| | E. Time Limits | 23 |
| Article 30 | Personnel Files | 23 |
| Article 31 | Confidentiality | 24 |
| Article 32 | Health and Safety | 24 |
| Article 33 | Separation from Employment | 24 |
| Article 34 | Severability | 25 |
| Article 35 | No Strike-No Lockout | 25 |
| Article 36 | Management's Rights | 26 |
| Article 37 | Cooperation Between the Parties | 27 |
| Exhibit A | Payroll Deduction Authorization | 28 |
| Appendix A | Minimums | |
| Appendix B | Fact Sheet on Employee Investigations | |

**UCP000151**

**UCP-UFT Collective Bargaining Agreement-- Residences**

Agreement made and entered into the 26th day of May 2010 by and between United Cerebral Palsy of New York City (herein "Employer") and United Federation of Teachers, NYSUT, AFT, AFL-CIO (herein "Union") acting on behalf of certain Employees of the Employer as hereinafter defined.

## Article 1
### Recognition

The Employer recognizes the Union as the exclusive collective bargaining representative of Employees certified in the following appropriate unit:

All full-time and regular part-time Senior Residential Program Specialists, Residential Program Specialists, Residence Program Specialists II, Cooks, Licensed Practical Nurses, Administrative Assistants, Physical Therapist Assistants, excluding all other employees including Managerial Employees, Confidential Employees, Supervisors and Guards, as defined in the Act.

Whenever the word "Employee" is used in this Agreement, it shall be deemed to mean the employees in the unit covered by this Agreement.

## Article 2
### No Discrimination

Neither the Union nor the Employer will discriminate against any Employee because of race, religion, sex, age, marital status, national origin, sexual orientation, color, citizenship status, union activity or non-activity, or disability unrelated to job performance.

## Article 3
### Effective Date and Duration

This Agreement will be effective from December 30, 2009 and will remain effective through June 29, 2012.

## Article 4
### Probationary Period

1. Duration. Except as set forth in section 2, a new Employee, whether or not formerly an Employee of the Employer, or an employee transferred into the bargaining unit from a different job title, or a bargaining unit Employee

UCP000152

voluntarily transferred to a different job title, will be on probation until the Employee has actually worked for six months in the new position or a pro-rata, i.e. extended equivalent for other than regular full-time Employees, excluding time for illness or any other non-work time.

2. Exceptions.

(a) An AMAP certified on call Employee who has worked for more than two years and transfers into a salaried position shall serve a three (3) month probationary period upon transfer. On-call Employees who are not AMAP certified at the time of transfer into a salaried position shall serve a probationary period of six months.

(b) Salaried Residential Employees who have completed a six (6) month probationary period prior to voluntarily returning to on-call status shall not serve a new probationary period.

(c) Salaried Residential Employees who have completed a six (6) month probationary period prior to being returned to on-call status as a result of not attaining a driver's license or AMAP certification shall serve a three (3) month probationary period.

(d) Residence Program Specialists II who have completed a six (6) month probationary period and are promoted into the Residential Program Specialist title shall serve a three (3) month probationary period.

3. Extension. By written agreement between the Union and the Employer, the applicable probationary period may be extended. Failure to extend the probationary period or to terminate the Employee during or at the end of such period means the Employee has successfully completed that period.

4. Rights. During or at the end of the probationary period the Employer may discharge or discipline a probationary Employee and such discharge or discipline shall not be subject to grievance or arbitration, but the Employee is otherwise covered by the provisions of the Agreement.


## Article 5
## Seniority

1. Seniority is defined as the length of time an Employee has been continuously employed on a full time basis by the Employer including all positions outside of the bargaining unit. Part time Employees accrue pro-rata seniority. On-call Employees do not accrue seniority.

2. An Employee's seniority shall commence on the date of his/her last hire, and shall accrue during his/her continuous employment with the Employer.

3. An Employee shall neither accrue nor lose seniority while he/she is on layoff or an unpaid leave of absence or any absences while he/she is not being paid by the Employer.

4. An Employee shall lose seniority, and seniority shall be broken if the Employee
   a. Voluntarily resigns; or
   b. is discharged; or

    c.  fails to report to work after a layoff within fourteen (14) calendar days after recall sent certified mail by the Employer to the Employee at his/her address of record on file with the Employer, except where verifiable serious illness or other provable reason acceptable to the Employer makes it impossible for the Employee to return on time and provided the Employee notified the Employer of the reason within three (3) days after recall; or

    d.  fails to report to work at the expiration of a leave of absence pursuant to this Agreement, except where verifiable serious illness or other provable reason acceptable to the Employer makes it impossible for the Employee to return on time and provided the Employee notifies the Employer of the reason within three (3) days prior to expiration of the leave of absence; or

    e.  fails to apply for re-employment within the statutory period after separation from military service; or

    f.  is laid off for twelve (12) months.

5.  An Employee whose seniority is lost for any of the reasons outlined in Paragraph 4 above shall be considered as a new Employee if he/she is again employed by the Employer. The failure of the Employer to re-hire said Employee after the loss of seniority shall not be subject to the grievance and arbitration provisions of this Agreement.

6.  Upon written request by the Union, the Employer will provide an updated seniority list to the Union every six (6) months.

### Article 6
### Union Security

**A. Union Shop**

1.  It shall be a condition of employment that every Employee who is a member of the Union in good standing as of the date of execution of this Agreement shall remain a member in good standing. Those Employees who are not members of the Union on the date of execution of this Agreement shall become and remain members in good standing of the Union no later than thirty days following the date of execution of this Agreement as a condition of employment.

2.  After the date of execution of this Agreement, every newly hired Employee will become a member of the Union within thirty days after the date of employment and thereafter will remain a member in good standing as a condition of employment.

3.  Whenever the Union charges that any Employee who is required by the provisions of this Article to become or remain a member of the Union in good standing has failed to do so, and the Union requests the discharge of such Employee, the Employer shall be so informed by the Union by certified or registered mail. The Employer shall have fourteen Days following the receipt of such notice, pursuant to the request of the Union, to discharge the Employee. If during the fourteen day period the Employee shall pay his or her delinquent dues, or the Union shall withdraw its request for termination, the Employer shall not be required to

discharge such Employee assuming the Employer has been so informed by the Union, by certified or registered mail.

4. "Good Standing" for the purpose of this Agreement shall mean the payment or tender of periodic dues, uniformly required as a condition of membership, to the Union.

## B. Payroll Deduction of Union Dues

1. An Employee who desires to become a member of the Union may execute a written authorization in the form annexed hereto as Exhibit A. Upon receipt of such authorization from an Employee the Employer will, pursuant to such authorization, deduct from the wages due the Employee in each pay period the regular dues fixed by the Union. However, the first deduction shall not be required to be made earlier than the first pay period following completion of the Employee's first thirty days of employment but will include the first thirty days of employment if authorized by the Employee.

2. The Employer shall be relieved from making such "check-off" deductions upon: (a) termination of employment, (b) transfer to a title outside the bargaining units, (c) layoff from work, (d) agreed leave of absence, or (e) revocation of the check-off authorization in accordance with its terms or with applicable law. Notwithstanding the foregoing, upon the return of an Employee to work from any of the above-mentioned absences, the Employer will immediately resume the obligation of making such deduction, except that deduction for terminated Employees shall require a new dues authorization form.

3. By the twentieth of each month, the Employer shall remit to the Union all deductions for dues made from the salary of Employees for the preceding month, together with lists (transmitted electronically) of all unionized Employees and Employees for whom dues have been deducted, including their social security numbers and the amount of dues deducted from each Employee's earnings.

## C. Employer Held Harmless

The Union agrees that it will hold the Employer completely free and harmless and fully indemnify the Employer from any claims, actions, damages, suits or costs of any type, attorney's fees, or proceedings related in any way to deduction, terminations or other actions pursuant to this Article.

## D. Union Rights

1. The Employer shall provide a bulletin board at each site where bargaining unit members are employed for the posting of official union business and communications. When such notices are posted, a copy shall be given to the Employer. No posted notice shall contain criticism or be of a derogatory nature with respect to the programs, policies, or personnel of the Employer, or be detrimental to the consumers. The Employer will make reasonable efforts to locate bulletin boards in an area accessible to all Employees.

2. The Union may utilize the Employer's internal mailboxes to disseminate official Union information and correspondence to bargaining unit Employees.

3. The Union may request the use of available space for staff meetings on a periodic basis. It is understood that use of this space will not interfere with normal program operations and will take place on the Employee's non-work hours. Permission to use such meeting space will not be unreasonably withheld.

4. The Employer shall permit the Chapter Leader of his/her designee to take time off without pay to attend monthly meetings of the citywide UFT Delegate Assembly. The Chapter Leader shall submit to the Director of the Program a copy of the monthly dates of the citywide UFT Delegate Assembly in September. If a change occurs in the meeting dates, the Chapter Leader will advise the Director as soon as possible.

5. A Union designated committee of no more than eight (8) people shall meet with representatives from Management three times per year to discuss matters of mutual concern. Additional meetings may be agreed upon in writing between the parties. The meeting shall begin at 4 pm and end by 5:30 pm. It is understood that these meetings will not interfere with normal program operations and that Employees will not be paid for their attendance. These meetings shall in no way be deemed negotiating sessions and no side agreements or other modifications of this Agreement shall result. The agenda items will be exchanged between the Union and the Employer four (4) days in advance of the meeting date.

6. A Union Representative who is not an Employee, who wishes to visit the workplace in the conduct of official Union business, or to attend a grievance hearing shall make a request to the Director of the Program or the Director of Human Resources, by stating the date and time of the visit. This request shall be made with two (2) days' notice unless an emergency situation arises. Permission for such visits will not be unreasonably withheld.

## E. New Unit Employee

The Employer will notify the Union in writing of each new bargaining unit Employee within ten (10) working days after the Employee's employment.

## F. Notification of Change of Status

The Employer will notify on a monthly basis, in writing, the Union at the end of each month of all bargaining unit employees who have resigned or been terminated.

### Article 7
### Rates of Pay, Minimums, and Health Care Supplements

## A. Rates of Pay

1. During the term of this Agreement each Employee (including Employees on leave who return to work at or before expiration of leave) shall receive the salary increases corresponding to his or her job title category (a) or (e) below.

2. The minimum job rates of each bargaining unit title are increased in the same manner and set forth in Appendix A.

3. Employees entitled to retroactive money shall receive payment in one separate check on June 4, 2010.
4. The minimum job rates and salary increases in effect for bargaining unit members shall not be less than those in effect for non-bargaining unit members in the same or comparable job titles.

Category (a)

Residential Program Specialists, Senior Residential Program Specialists, Residence Program Specialists II, Cooks, and the following Employees funded through OMRDD sources-- Administrative Assistants, Licensed Practical Nurses, Physical Therapy Assistants.

| Incumbent Salary Increase Effective Date | Payment Date | Salary Increase |
|---|---|---|
| 11/30/09 | 6/4/10 | 3% |

The above-mentioned salary increase shall be applied to all regular, additional, holiday, and overtime hours worked by category (a) employees retroactive to 11/30/09.

Category (e)

Residential Program Specialist On-Calls

| Incumbent Salary Increase Effective Date | Payment Date | Salary Increase |
|---|---|---|
| 5/10/10 | 6/4/10 | 3% |

## B. Health Care Supplements

1. In addition to the salary increases provided in Section A above, full time and part time category (a) Employees hired prior to 4/1/10 (including Employees on leave who return to work) shall receive the applicable health care supplements specified below.

<u>Category (a) Employees</u>

| <u>Payment Date</u> | <u>Payment Amount</u> | <u>Payment Type</u> |
|---|---|---|
| 4/1/10 | $1,000 | health reimbursement account |

2. The health care supplements for bargaining unit Employees shall not be less than the health care supplements for non-bargaining unit Employees in the same or comparable job titles.
3. The Employer shall apply for the OMRDD Health Care Initiative in each year in which it is available.

C. Re-Opener

On or before April 1, 2011 either party may give written notice of its intent to re-open Article 7 (Wages, Minimums, and Health Supplements). If such notice is timely given, the parties shall meet to negotiate in good faith the terms of Article 7, including but not limited to the use of unexpended funds that may exist as of June 30, 2011 and anticipated revenues and expenditures for the fiscal year commencing July 1, 2011. The parties agree that the resulting wages, minimums, and health supplements for bargaining unit members shall not be less than those in effect for non-bargaining unit members in the same or comparable job titles.

**Article 8**
**Pension Plan**

1. The Employer shall continue to provide pension benefits to Employees covered by this Agreement.

2. The pension benefits for bargaining unit Employees shall not be less than those in effect for non-bargaining unit Employees in the same or comparable job titles.

3. The Employer shall notify the Union no later than three months prior to any possible change in pension benefits for bargaining unit members.

4. A joint UCP/UFT committee will begin meeting no later than three months prior to any possible change in pension benefits for the purpose of exploring and identifying future options regarding such benefits for bargaining unit Employees.

5. The Employer, the Union, and the Employees shall comply with the Employee Retirement Income Security Act (ERISA) and other laws as applicable.

 **UCP000158**

## Article 9
## Health and Dental Benefits

1. The Employer shall continue to provide health and dental benefits to the Employees covered by this Agreement. The health benefits for bargaining unit members during the plan year May 1, 2010 through April 30, 2011 are set forth in the Stipulation of Agreement between the parties dated April 13, 2010 and shall be incorporated into the collective bargaining agreement.

2. The health and dental benefits in effect for bargaining unit members shall not be less than those in effect for non-bargaining unit Employees in the same or comparable job titles.

3. The Employer shall notify the Union no later than two months prior to any possible change in health or dental benefits for bargaining unit members.

4. A joint UCP/UFT committee will begin meeting no later than two months prior to any possible change in health or dental benefits for the purpose of exploring and identifying future options regarding such benefits for bargaining unit members. A minimum of two alternative options will be explored.

5. The parties will negotiate in good faith in an effort to reach agreement no later than April 15th during the term of the collective bargaining agreements regarding any changes to existing health or dental benefits for bargaining unit members.

6. In the event that the premium of any existing or new health insurance plan increases effective April 1, 2010, the Employer will absorb a premium increase of up to 3%.

7. The Union shall be offered the option of (a) renewing the plan, if available, no later than April 15th of each contract year; or (b) choosing one of the alternative plans presented, with Employees paying the premium increase above 3% in either (a) or (b).

8. The steps outlined in this section shall apply each year during the term of the collective bargaining agreements.

## Article 10
## Vacations

1. Full-time Employees shall accrue vacation days based upon job title. Information regarding vacation entitlement shall be made available to each Employee at his/her time of hire. Employees who have completed twenty-six (26) weeks of employment shall accrue one-half year's worth of vacation time. Following the

initial twenty-six (26) week credit, Employees shall accrue vacation time per four (4) week cycle in accordance with UCP existing policy. Full-time Employees, other than those listed below, have the following annual vacation entitlement:

| Years of Service at UCP | Annual Vacation Entitlement |
|---|---|
| 1 – 3 | 10 days |
| 3 – 5 | 15 days |
| over 5 | 20 days |

Employees in job titles whose annual vacation entitlement is twenty (20) days upon completion of one (1) year of UCP service on the date of ratification of this Agreement shall continue to be so entitled.

2. Part-time Employees shall earn vacation days on a pro-rated basis.
3. Hourly Employees do not accrue vacation time.
4. Employees may carry over unused vacation time into the next fiscal year (commencing July 1st).
   a. The amount of vacation time that may be carried over is limited to one and one-half (1 ½ ) times the annual accruals for full-time Employees
   b. The amount of vacation time that part-time Employees may carry over is pro-rated based on their part-time schedule and the prorated equivalent of the vacation limits for full-time Employees.
   c. Exceptions to the 4a limits may be granted in writing by the Executive Director or his/her designee only if the Employee makes a written request for vacation utilization by March 30th which has been denied. Denials of exceptions shall be neither arbitrary nor capricious.
5. Upon separation from employment, the Employer shall pay accrued but unused vacation leave up to the limits indicated above to Employees who provide the required notice or acceptable reason of hardship and according to applicable law.


**Article 11**
**Holiday Leave**

1. Full-time Employees are eligible to take off or accrue leave for the following paid Agency holidays:

| | |
|---|---|
| New Year's Day | Labor Day |
| Martin Luther King Day | Yom Kippur (weekday only) |
| President's Day | Presidential Election Day |
| Good Friday | Thanksgiving Day |
| Memorial Day | Friday after Thanksgiving |
| Independence Day | Christmas Day |

Agency holidays that fall on a Saturday will be observed on the Friday before. Agency holidays that fall on a Sunday will be observed on the following Monday.

2. Presidential Election Day, Good Friday and Yom Kippur are floating holidays.

3. An annual holiday schedule will be made available to all Employees at the beginning of each calendar year.

4. An Employee must be either at work or on paid leave on the workdays before and after a holiday to be paid for that holiday. An Employee who calls in sick before or immediately following an Agency observed holiday on which the Employee is scheduled to be off may be required to submit a doctor's note in order to receive holiday pay.

5. Full-time Employees will accrue one (1) day of holiday leave for an Agency observed holiday that falls on a regularly scheduled day off. Full-time Employees required to work on a holiday will be paid for the day worked and accrue one (1) day of holiday leave.

6. Part-time Employees may use or accrue holiday leave only for those Agency observed holidays that fall on a day on which they are regularly scheduled to work. Part-time Employees who work on a holiday earn holiday leave equivalent to the amount of time they work on the holiday to a maximum of eight (8) hours at the work site.

7. Residential Employees, including those who work on-call, shall be compensated at a rate equal to time and one half of their regular rate of pay for work performed on the following holidays:

   New Year's Day (6 PM New Year's Eve – 6 PM New Year's Day)
   Independence Day (July 4th)
   Thanksgiving Day
   Christmas Day (December 25th)

   The Employer shall continue its policy of offering Employees the option to cash in holiday time accrued on these holidays.

8. Accrued holiday leave must be used by the end of the payroll period ending immediately before June 30th in the year in which it was earned, except as agreed to in writing by the Executive Director or designee upon written request from the Employee. Such requests from Employees who, prior to March 30th, have submitted and been denied a request to use holiday leave shall not be arbitrarily or capriciously denied.

9. Accrued but unused holiday leave may not be converted to pay upon separation from the Employer.

## Article 12
## Request to Use Accrued Holiday Leave or Vacation

1. Employees wishing to use accrued holiday or vacation time will submit a written leave request that includes the date of submission to their supervisor sufficiently ahead of time to plan for adequate staffing and program coverage. This form shall be approved or denied by the Employer and returned to the Employee within two (2) weeks of submission.

2. When scheduling holiday or vacation time, the supervisor will consider Employee preferences and agency needs. If the Employer is unable to accommodate the preferred vacation requests of all applicants, seniority shall govern among those applicants in the same job title applying simultaneously for the same dates. However if the senior applicant in the job title previously received his/her choice and other eligible applicants did not, the request of the senior eligible applicant in that job title who did not previously receive his/her choice shall have first preference for approval.

## Article 13
### Personal Days

1. Full-time Employees who have completed fifty-two weeks of continuous full-time employment shall accrue two (2) personal days per year on their anniversary date of hire.
2. Personal days must be used by full-time Employees prior to their anniversary date. They may not be carried into the next year or converted to pay upon separation from the Employer.
3. Hourly and part-time Employees do not accrue personal leave.
4. Employees shall request personal days of the Employer with as much advance notice as possible, but not more than three (3) months in advance, by completing an accrued leave request form that includes the date the request is submitted. The Employer shall respond in writing within two weeks of the date of the request.
5. In the event that two or more Employees request the same personal day(s), approval shall be granted in order of the date the requests are submitted, or by seniority in the event that requests are submitted on the same date.
6. All Employer approvals or denials shall be based upon consumer and operational needs and be at the sole discretion of the Employer.

## Article 14
### Sick Leave

1. Full-time Employees shall earn ten (10) paid sick days per year.

2. Part-time Employees shall earn paid sick days on a pro-rated basis.

3. Employees accrue paid sick leave from the beginning of their employment and become eligible to use such leave following thirteen (13) weeks of continuous employment.

4. Employees may carry over accrued sick leave into the next fiscal year (commencing July 1st). There is no limit on the amount of paid sick leave an Employee may accrue.

5. An Employee who is unable to report to work due to their own illness or illness of a child and who requests to use paid sick leave will contact his/her supervisor or their designee. Notification must be made one (1) hour in advance of the work day for Day Program Employees and two (2) hours in advance of the work day for evening, night, and weekend Employees, except in cases of proven inability to furnish such notice, and Employees shall continue to give such notification on a daily basis unless another arrangement has been made.

6. An Employee with no documented record of excessive sick time usage will not routinely be required to provide a doctor's note following less than three consecutive days of absence.

7. The value of accrued sick leave is not payable to an Employee upon separation from employment.

## Article 15
## Leaves of Absence

### A. Bereavement Leave
1. An Employee who completes twenty-six (26) weeks of continuous full-time employment is entitled to paid leave in the event of the death of a member of the Employee's family, as follows:
      a. a maximum of three (3) work days for the death of an immediate family member, defined as a parent, grandparent, spouse, sibling, or child.
      b. one (1) work day for the death of an aunt, uncle, parent-in-law, daughter-in-law, son-in-law.
2. Bereavement leave will be taken as close as possible to the time of death of the Employee's family member, however in no event more than one (1) month from the date of death.
3. An Employee who requires additional time-off for a death in the Employee's family may request to use accrued vacation, holiday, or leave without pay days, subject to written approval from the Employer. Such requests shall not be unreasonably denied.
4. The Employer may request that the Employee provide documentation to verify the appropriate use of bereavement leave.
5. Part-time Employees are entitled to bereavement leave on a prorated basis.
6. Hourly Employees are not entitled to bereavement leave.

### B. Jury Duty
1. An Employee summoned for jury duty is expected to present a copy of the jury duty notice promptly to the Employer and to return to work whenever excused from jury duty and when it is concluded.
2. Full-time and part-time Employees will be paid by the Employer at their regular rate of pay for the duration of their jury service. Hourly or per diem Employees

who work regular shifts will be paid by the Employer for the first three (3) days of jury service, provided these are regularly scheduled work days for the Employee.

3. The Employer reserves the right to request that an Employee be excused from jury duty based upon agency needs.

4. The Employer may request and the Employee must submit documentation substantiating jury duty attendance.

## C. Military Leave

1. Leaves of absence for performance of duty with the US Armed Forces, with a reserve component of the National Guard thereof shall be granted in accordance with applicable law.

2. Employees who are eligible for vacation, personal, or holiday leave may use such leave while on military leave. Exhaustion of all leave credits is not required for military leave.

## D. Short-Term Disability Leave

1. The Employer and Employee will comply with the provisions of the NY State Disability Benefits Law.

2. Employees who have accrued leave may use available accrued leave during a period of short-term disability.

3. Employees receiving short-term disability benefits are also considered on FMLA leave simultaneously up to the first twelve (12) weeks of the FMLA year they are absent due to disability.

## E. Family and Medical Leave Act (FMLA)

The Employer and Employee will comply with the provisions of the Family and Medical Leave Act, as amended.

## F. Workers Compensation

The Employer and Employee will comply with the provisions of the New York State Workers' Compensation Law.

## G. Leave Without Pay

1. An Employee who completes fifty-two (52) weeks of continuous employment and has exhausted all paid leave may request a Leave Without Pay to a maximum of twenty-six (26) weeks for sickness or disability. The Employee will request such leave with as much advance notice as possible. The Employer shall respond in writing to the Employee, or verbally if there is not sufficient time from the date of the request, prior to the requested start date of the leave.

   a. In order to be eligible for such leave, the Employee will present medical verification that he/she is unable to work.

   b. An Employee who is on Leave Without Pay shall not receive compensation from the Employer, but may receive short-term disability or workers' compensation payments, where applicable, if such payments have not been exhausted during the Employee's paid leave.

UCP000164

    c. During an approved Leave Without Pay, the Employer shall maintain an Employee's existing benefits, including life, health, and disability coverage for a maximum of twelve (12) weeks. Employees who are unable to return to work after twelve (12) weeks will be notified in writing of the options and costs of continuing their existing benefits under COBRA.

    d. The Employer reserves the right to request periodic medical verification of an Employee's disability.

2. An Employee on FMLA leave for reasons other than his/her own disability may also be granted Leave Without Pay for the remaining fourteen (14) of the twenty-six (26)weeks if his/her need for such leave is substantiated by credible documentation.

3. An Employee does not accrue vacation, personal, holiday or sick days while on Leave Without Pay.

4. An Employee may request Leave Without Pay for compelling reasons other than his/her own disability or the disability of a family member. The Employee will request such leave with as much advance notice as possible.

    a. The Employer shall respond in writing to the Employee, or verbally if there is not sufficient time from the date of the request, prior to the requested start date of the leave. In evaluating whether to grant such a request, the Employer will consider the compelling nature of the request and agency needs. Such requests shall not be unreasonably denied.

    b. If Leave Without Pay is granted for reason other than disability, it is understood that the same policies apply regarding the duration of the leave, documentation related to the reason for the leave, and Employee rights upon return from the leave.

5. Employees who are unable to work and denied leave without pay will be informed in writing by the Employer of their placement on non-active status for a period of ninety (90) days. Non-active Employees shall be entitled to continue medical coverage as allowed by COBRA, as well as Worker's Compensation and disability benefits in accordance with the determination of the carrier and the law. Employees who notify the Employer during this ninety (90) day period of their ability to return to work and perform the full duties of the job will be given reasonable consideration for reinstatement to their position (if still available) or to another position within the agency. Employees who do not contact the Employer within ninety (90) days of being placed on non-active status or are unable to return to full duties will be terminated.

6. An Employee planning to return from Leave Without Pay shall notify his/her supervisor at least two weeks before the scheduled date of return and submit medical clearance stating that he/she can return to work and perform the full, essential duties of his/her job. The Employer will make reasonable efforts to reinstate an Employee who returns from Leave Without Pay to a similar position within the Agency.

## Article 16
## Voluntary Benefits

The Employer will continue its current policy on the following voluntary benefit programs—Transitcheck, 403(b), Life Insurance (term or universal), Flexible Spending accounts, Municipal Credit Union, and Short term Disability.

## Article 17
## Tuition Assistance

1. UCP will continue its policy of tuition assistance to bargaining unit Employees on the same terms as other UCP employees.

2. Copies of the Employer's policy regarding participation in this program shall be provided to Employees upon request.

## Article 18
## Employee Referral Program

1. Employees shall be eligible to participate in UCP's Employee Referral Program to the same extent as non-bargaining unit employees.

2. Copies of the Employer's policy regarding participation in this program shall be provided to Employees upon request.

## Article 19
## Administration of Medication

1. UCP and the Employees shall comply with all applicable laws and regulations regarding the administration of medication by Employees to consumers.

2. The Employer will make reasonable efforts to provide Employees with the opportunity to take and complete AMAP training prior to the end of the Employee's probationary period.

3. The grandparenting policy with regard to current Employees not required to administer medication to consumers will remain in effect.

## Article 20
## Driving of Agency Vans

1. UCP and the Employees shall comply with all applicable laws and regulations regarding the driving of agency vans.

2. Employees will not be required to drive an agency van until they have held a valid driver's license for six months and have completed the agency's training program.

3. Direct care staff required to drive agency vans will be given priority to take the agency's defensive driving course.

4. The following Employees shall continue to be grandfathered from driving:
   - Employees hired before June 18, 2003 who have not driven an agency van while employed at the agency.

5. Upon request to the Employer, Employees issued a summons for moving or non-moving violations while using an agency vehicle will be provided with the opportunity and documentation to dispute the summons at the Traffic or Parking Violations Bureau.

## Article 21
## Fingerprinting and Employee ID Cards

Management will continue its policy of covering the costs of fingerprinting and the initially issued UCP employee identification card.

## Article 22
## Employee Expenses and Reimbursement

Employees will be reimbursed within a reasonable time period following submission of receipts or other acceptable documentation for reimbursable expenses.

## Article 23
## Training of Employees

The Employer shall comply with OMRDD policies and regulations regarding training of employees.

## Article 24
## Past Practices

The Employer, in compliance with the law, will subject to negotiations, continue all past practices involving wages, hours and terms and conditions of employment.

## Article 25
## Hours of Work

**A. Regular Work Day and Work Week**
1. The hours per week regularly worked by a full time or part-time Employee shall not be reduced during the term of the Agreement, except for lack of work. If the hours of Employees in a particular title must be reduced because of lack of work, the least senior Employees in the title at the bargaining unit site shall have their hours reduced or eliminated before more senior Employees, provided the remaining Employees are qualified to do the work required.
2. Employees who regularly work at least four (4) hours a day shall have a meal period of not less than thirty minutes per day.
3. For all Employees entitled to a meal period longer than thirty (30) minutes on the date of ratification of this Agreement, the Employer shall continue its current policy regarding meal period entitlements.
   The Employer shall inform Employees in writing at the time they are hired of:
   a. the daily starting and ending time of their shift
   b. the length of their meal period
4. If it becomes necessary to change an Employee's work schedule/shift at any site, the Employer shall seek qualified volunteer(s) in the affected title at that site. If there are no, or an insufficient number of qualified volunteer(s), the Employer shall change the work schedule/shift of the least senior qualified Employee(s) in the affected title at that site. An Employee whose schedule/shift is involuntarily changed shall be informed of the reason for the change, provided advance notice before implementation and preference to revert to his/her previous work schedule/shift if an opportunity becomes available to do so within one year of the involuntary change of schedule.

**B. Timekeeping**
1. The Employer will continue its current policy regarding procedures for completion and review of time and attendance sheets.
2. Effective no later than August 29, 2006, the Employer will, after an Employee's completion and submission of time and attendance sheets, begin providing On-call Employees with a record of their days and hours worked during each pay period.
3. Salaried staff who move to on-call status shall be paid for their existing balance of accrued vacation time, to a maximum of one and one half (1 ½) times their annual vacation accruals.

                                                      UCP000168

### C. Overtime
1. Employees shall be paid at their regular hourly pay rate for authorized time worked in excess of their regularly assigned hours of work, up to forty (40) hours per week.
2. Employees shall be paid additionally at one and one-half (1 ½) times the Employee's regular hourly pay rate for authorized time worked in excess of forty (40) hours in a work week.
3. If overtime is necessary, the Employer shall first seek qualified volunteers in the job title(s) at the bargaining unit work site where the need arises. If an insufficient number of qualified Employees volunteer, overtime shall be assigned to qualified, on-duty Employees in the job title(s) at the bargaining unit work site where the need arises, in reverse order of seniority.
4. Notice of overtime shall be given to Employees as soon as is reasonable for the need to have become known to the Employer.

### D. Training and Staff Meetings
1. Employees shall be compensated for all time spent attending training or staff meetings beyond their regular hours of work.
2. With the exception of AMAP training, The Employer will offer alternative arrangements for Employees who, due to compelling personal circumstances, are unable to attend training or staff meetings beyond their regular hours of work. Employees must attend the next training session for which they are scheduled.
3. Employees who complete OMRDD required training for which certification is issued shall receive a copy of their certification upon request.

### Article 26
### Overnight Trips

Upon being asked to accompany consumers on overnight trips, the Employer shall provide Employees with a fact sheet on such trips as agreed between the parties.

### Article 27
### Vacancies, Transfers, Promotions, Layoffs and Recalls

### A. Posting Vacancies
The Employer shall post vacancies showing the work hours and locations of bargaining unit positions for at least five days. The posting shall be dated. Applicants shall be transferred or promoted to such bargaining unit vacancies as set forth below.

UCP000169

## B. Voluntary Transfers and Promotions

1. When two or more applicants apply in writing for a lateral transfer to a bargaining unit vacancy or promotion to a bargaining unit vacancy, an applicant shall be selected by UCP taking competency, agency needs, consumer needs and job performance into consideration. As used herein, a "lateral transfer" is a transfer to a comparable position at a comparable pay level. A promotion is a transfer to a higher paid position.

2. Part-time residential unit Employees shall have preference over on-call Employees for additional hours and for full-time positions based on their seniority, if they meet the posted qualifications. Residential Employees who work on-call shall have preference for regular part-time or full-time residential positions over new hires (but not over part-timers), if they meet the posted qualifications. The Employer may, on infrequent occasions, not transfer or promote part-timers or on-callers due to criteria listed in B1. The Employer shall not act arbitrarily or capriciously in this regard.

## C. Layoffs and Recalls

1. The Employer shall notify the Union of an impending layoff of bargaining unit members, and it shall meet promptly, if requested by the Union, to try to resolve any issues, including possible alternatives to layoffs, before layoffs are implemented.

2. In the event of a reduction in force in the bargaining unit, the least senior Employee in the relevant bargaining unit job title shall be laid off provided the remaining Employees are qualified to do the work required. The Employer shall give affected Employees at least thirty days' written notice of layoff. Part-time Employees are laid off and recalled separately from full-time Employees.

3. Laid off Employees shall be placed on a list for recall to the same or a comparable position with the Agency when one becomes available. Probationary Employees who have been laid off have no recall privileges.

4. The Employer shall offer vacant bargaining unit positions that subsequently become available to qualified Employees on recall lists in seniority order before posting them and filling them.

5. Employees recalled to work are expected to return within fourteen (14) calendar days after recall sent certified mail by Employer to the Employee at his/her address of record on file with the Employer except where verifiable serious illness or other provable reason acceptable to the Employer makes it impossible for the Employee to return on time. The Employee shall notify the Employer of his/her acceptance or rejection of the recall and the reason for any inability to return on time within three (3) days after recall.

6. An Employee who is recalled from layoff to a non-bargaining unit position but who requests to be returned to the bargaining unit shall be transferred back into a bargaining unit vacancy in accordance with his/her seniority if an appropriate bargaining unit vacancy occurs for which the Employee is competent and qualified.

7. The recall rights of Employees are effective until one year following their date of layoff.

**D. Transfers Within the Unit**
1. The Employer may transfer Employees from their work site to another work site for reasons of agency or consumer needs. Said transfers shall be neither arbitrary nor capricious.
2. Before involuntarily transferring any Employee from their work site to another work site, the Employer shall seek qualified volunteer(s) in the title. If there are no, or an insufficient number of qualified volunteer(s), the Employer shall transfer the least senior qualified Employee(s) in the title from their work site to another. An Employee who is to be involuntarily transferred within the unit shall be informed of the reason for the transfer and provided with advance notice.
3. Upon their request, Employees shall be transferred back to their work site as soon as practical.
4. The Employer may transfer an Employee within the Unit for disciplinary reasons, without adhering to D2 or D3. Such transfers shall be made in consultation with the Union.
5. The parties have agreed to this provision with the expectation that it will be used infrequently.

**E. Transfers Out of the Unit**
1. The Employer may transfer Employees out of the bargaining unit for reasons of agency or consumer needs. Said transfers shall be neither arbitrary nor capricious.
2. Before involuntarily transferring any Employee out of the bargaining unit, the Employer shall seek qualified volunteer(s) in the title. If there are no, or an insufficient number of, qualified volunteer(s), the Employer shall transfer the least senior qualified Employee(s) in the title. An Employee who is to be involuntarily transferred out of the unit shall be informed of the reason for the transfer and provided advance notice.
3. Upon their request, Employees shall be transferred back into the bargaining unit as soon as practical. Employees transferred out of the bargaining unit shall suffer no reduction in fringe benefits.

**F. Disputes**
Disputes arising under this Article are subject to grievance and arbitration, but an arbitrator may not substitute his/her judgment of competency, consumer needs, qualified agency needs and job performance for that of UCP's determination unless UCP's determination is arbitrary or capricious.

**Article 28**
**Due Process**

**A. Disciplinary Interviews**
The Employer, the Union and Employees shall abide by the *Weingarten decision*, as amended by law, when an Employee requests Union representation at a disciplinary interview with Management.

**B. Discipline and Discharge**
1. The Employer shall have the right to discharge, suspend, or discipline any Employee for just cause.
2. Employees who are found, pursuant to an arbitration proceeding, to have engaged in a heinous or detestable act of abuse against a consumer, will be terminated. Employees who have been the subject of false or inconclusive accusations of such an act will be made whole.

**C. Employee Investigations**
The parties have agreed to a "Fact Sheet on the Investigation Process", a copy of which is contained in Appendix B and deemed a part of the collective bargaining Agreement.

**Article 29**
**Grievance and Arbitration Procedure**

**A. Definition**
A grievance is a claim that a provision of this Agreement has been violated. The Union or the Employer may initiate a grievance.

**B. Informal Resolution**
It is the intent of the parties to resolve individual grievances promptly, without recourse to the formal grievance procedure. Therefore, an individual grievant and the Chapter Leader (or his/her designated representative) shall meet with the immediate supervisor and attempt to resolve the grievance informally. If there is no resolution, the formal grievance procedure shall apply.

It is mutually agreed that nothing herein will prevent the Employee from voluntarily discussing problems with his/her supervisor or other representatives of Management with or without his/her union representative prior to initiating a formal grievance or prior to exercising his/her Weingarten Rights under Article 28 (Due Process) of this Agreement. However, neither the Employer nor the Union shall intimidate, coerce, or cause an Employee or Manager to suffer any reprisals, either directly or indirectly, that may adversely affect his or her hours, wages, or working conditions as the result of the exercise of his or her rights under this Article.

**C. Formal Grievance Procedures**
1. Grievances Initiated by the Union
Upon request of either party, the Union and the Employer will exchange lists of individuals who may act in the capacity of "designated representative" (for the Union) and "designee" (for the Employer) at Step One and Step Two, and update as appropriate.

Step One

A formal grievance shall be submitted by the Union to the Employer's Designee ("Designee") within ten days of the date the facts giving rise to the grievance were known to the grievant or reasonably should have been known. The grievance shall be in writing and shall set forth the claim and identify the contractual provision(s) alleged to have been violated and the bargaining unit member(s) affected. It shall also set forth the remedy sought.

The Designee or designated alternate shall meet with the grievant and the Chapter Leader (or his/her designated representative) within ten days of the submission of a formal grievance. The written decision of the Designee, will be given to the Chapter Leader (or his/her designated representative) and the grievant within ten days of the meeting at this Step.

Step Two

If the grievance is not resolved at Step One, the Union may appeal in writing to the Executive Director of UCP (or designee) within ten days after receiving the Step One answer. The Executive Director or designee shall meet with the grievant and the Chapter Leader (or his/her designated representative) within ten days after receipt of the appeal and attempt to resolve the grievance. The answer of the Executive Director or designee shall be given in writing to the Union within ten days after the meeting and shall set forth the reason if the grievance is denied.

2. Group Grievances

Upon written agreement of the Union and the Employer, the Union shall have the right to initiate a Step Two grievance which affects a substantial number or class of Employees and which the Employer's representative designated in Step One lacks authority to settle. Such grievance shall be filed within ten days after the facts giving rise to the grievance were known or reasonably should have been known.

3. Grievances Initiated by the Employer

UCP may file a grievance against the Union by submitting to the Union President (or designee) a written statement of the grievance within ten days of the date the facts giving rise to the grievance were known to UCP or reasonably should have been known. A meeting between UCP and UFT to discuss the grievance will be convened within ten days thereafter. In the event that UCP and UFT are unable to resolve the grievance, the grievance may be submitted to arbitration by the Employer in the same way the Union submits its grievances to arbitration hereunder.

**D. Arbitration**

If the grievance is not resolved at Step Two, the Union, within fifteen days after receiving the Step Two answer or after the failure to answer within the time limit, may submit a notice of arbitration to the Employer, with a copy to the American Arbitration Association (A.A.A). The notice shall include a brief statement setting

forth the issue to be decided by the arbitrator, the specific provision(s) of the Agreement involved and the remedy sought.

The Union shall request the AAA to submit simultaneously to each party an identical list of names chosen from the Panel of Labor Arbitrators for selection of an arbitrator, in accordance with the Labor Arbitration Rules of the AAA, to hear and decide the case.

The arbitration shall be handled in accordance with the then existing Labor Arbitration Rules of the AAA related to the hearings and fees and expenses. The arbitrator shall have no authority to add to, subtract from, alter, amend or in any way modify the terms and provisions of the Agreement. The fees and expenses of the arbitration shall be borne equally by the Employer and the Union. Each party shall bear the expenses of preparing and presenting its case at arbitration. The arbitrator's written decision and opinion shall be issued not later than thirty days from the close of the hearings. The decision shall be final and binding on the Union, the Employer and the Employees.

**E. Time Limits**

1. The time limits specified in this Article shall be deemed to be exclusive of Saturdays, Sundays and holidays.
2. Failure on the part of the Union to appeal a grievance to the next step within the specified time limit shall be deemed to be acceptance of the decision rendered at that step. Failure on the part of the Employer to answer a grievance at any step within the specified time limit shall not be deemed acquiescence thereto and shall entitle the Union to proceed to the next step or to arbitration, as applicable.
3. A grievance concerning discharge or suspension may be initiated by the Union at Step Two of the formal grievance procedure provided that it is initiated within the time period set forth in Step One.
4. In any specific grievance the time limit at any step may be extended by written agreement between the Employer representative at that step and the Chapter Leader (or his/her designated representative).
5. Failure on the part of the Union or the Employer to submit a grievance within the time limits shall result in the forfeiture of the right to file the grievance with prejudice.

**Article 30**
**Personnel Files**

1. There shall be only one official personnel file for each Employee located within the UCP Human Resources Department. Each Employee shall have free access (which shall not be abused) to his/her file for the purpose of examination and making copies of materials within the file.

2. Materials placed in the personnel file should only be job-related and not related to personal matters—such as family situations, etc.

3. No materials except those to which the Employee has had a chance to read, sign and/or respond to in writing shall be placed in the file.

4. Material in the personnel file that is shown to be false or inaccurate as a result of a grievance arising under Article 28B (Discipline and Discharge) shall be corrected or expunged as appropriate, in accordance with the express terms of the decision in the grievance or arbitration.

## Article 31
## Confidentiality

The parties will comply with the agency's confidentiality policy.

## Article 32
## Health and Safety

1. The Employer, the Union and the Employees shall comply with applicable Federal, State, and City health and safety statutes, rules, and regulations.

2. The Employer will respond in a timely fashion to health and safety issues.

## Article 33
## Separation From Employment

1. Any Employee who terminates his/her employment by resignation shall give the Employer two (2) weeks advance written notice.

2. Exceptions to the two weeks written notice requirement for reasons of hardship shall not be unreasonably denied.

3. The effective date of notice is the date the resignation letter is received in the Director's Office. Upon receipt of such notice, the Director or his/her designee will provide the Employee with a written acknowledgment of the effective date of resignation.

4. Upon separation from employment, the Employer shall pay the following to Employees who provide the required notice and according to applicable law— accrued but unused vacation time to a maximum of one and one-half (1 ½) times the annual accrual for full time Employees; or for part-time Employees, the pro-

rated equivalent based upon their part-time schedule and the pro-rated vacation limits for full-time Employees.

5. If the above notice and dates are not complied with, except in cases of hardship as above, an Employee shall forfeit accrued but unused vacation time. Accrued unused sick, personal days, and holidays are not payable at termination or resignation.

6. During the resignation notice period Employees will not be entitled to use sick, vacation, floating holidays, or personal time.

## Article 34
## Severability

Should any part of this Agreement or any provision contained herein be rendered or declared invalid by reason of any existing or subsequently enacted legislation or by a court of competent jurisdiction, such invalidation of such part or provision of this Agreement shall not invalidate the remaining portions of this Agreement and they shall remain in full force and effect. Neither shall any provision of this agreement negate any applicable stature or regulation.

This Agreement shall constitute the sole and entire agreement between the parties with respect to rates of pay, wages, hours and all other conditions of employment. It may not be amended, modified, waived, extended or otherwise revised except by agreement in writing duly executed by the parties.

## Article 35
## No Strike- No Lockout

1. During the term of this Agreement, the Union, on behalf of its officers, agents and members, agrees that there shall be no strikes (economic, unfair labor practice, sympathy or otherwise), slowdowns, walkouts, sit-downs, picketing or boycotts which interfere in any manner with the Employer's operations. Such prohibition does not prevent off duty Employees or Union staff from engaging in lawful organizing activities at non-organized employer facilities.
2. During the term of this Agreement the Employer, on behalf of its officers, administrators, supervisors and agents, agrees that there shall be no lockouts of Employees covered by this Agreement.
3. The term "strike" shall include a refusal to report for work because of a primary or secondary picket line at the Employer's premises so long as the Employer provides safe access to its premises.
4. If during the term of this Agreement a strike or a lock-out occurs, the Union (if there is a strike) or Employer (if there is a lock-out) within twenty-four hours of a request by the other party shall:

    a. Publicly disavow such action
    b. Advise the other party in writing that such action has not been called or sanctioned by it.
    c. Notify the participants of its disapproval of such action, instruct them to cease the action and return to work immediately.

## Article 36
## Management's Rights

1. Except as otherwise specifically provided, limited or modified by this Agreement the Employer retains the exclusive right to manage the business, to direct, control and schedule its operation and workforce, and to make any and all decisions affecting the business whether or not specifically mentioned herein and whether or not heretofore exercised. Examples of such prerogatives shall include, but not be limited to, the sole and exclusive rights to: hire, promote, layoff, assign, transfer, suspend, discharge and discipline Employees; select and determine the number of Employees, including the number assigned to any particular work; increase or decrease that number; direct and schedule the workforce; determine the location and type of operation; determine and schedule when overtime shall be worked; install or remove equipment and determine the methods, procedures, materials and operations to be utilized provided that Employees shall be trained by the Employer in the safe and effective use of any such equipment, methods, procedures, materials and operations; transfer or relocate any or all of the operations by sale or otherwise, in whole or in part; determine the work duties of Employees; promulgate, post and enforce rules and regulations governing the conduct and acts of Employees during working hours; discontinue or reorganize or combine any operation with any consequent reduction or other change in the workforce; establish, change, combine or abolish job classifications; determine work performance levels and standards of performance of the Employees and in all respects carry out the ordinary and customary functions of management.
2. The Employer's failure to exercise any of the functions stated herein shall not constitute a waiver thereof.
3. The Employer has the right to schedule its management and supervisory personnel. Supervisors will not regularly perform bargaining unit work, but may do so as necessary. The selection of supervisory personnel shall be the sole responsibility of the Employer, and such selection shall not be subject to the grievance and arbitration provisions of this Agreement.
4. The foregoing statement of the rights of Management and of Company functions are not all-inclusive, but indicate the type of matters or rights which belong to and are inherent in management and shall not be construed in any way to exclude other ordinary and customary Employer functions not specifically enumerated above.
5. It is understood that upon demand by the Union, the Employer shall negotiate regarding its decisions and/or the impact of the decisions as mandated by applicable law.

## Article 37
## Cooperation Between the Parties

UCP and the UFT will cooperatively attempt to maximize UCP revenues and funding and enhance employee salaries and benefits by approaching City, State, and Federal governments. Utilization of said enhanced revenues and funding will be discussed by the parties in advance.

For the Union:

_____    Date  9/21/10

For the Employer:

_____    Date  9/21/10

**Exhibit A**
**Payroll Deduction Authorization**

Pursuant to applicable law, I assign to the United Federation of Teachers (UFT) from my compensation as any employee of United Cerebral Palsy of NYC (hereinafter called "my employer") one percent (.01) of my gross pay or such different amount as UFT fixes as its regular dues, and direct my employer to withhold this sum from the compensation due me each pay period and remit it to the UFT.

I submit this assignment and authorization with the understanding that it will be effective and irrevocable for a period of one year from this date or up to the termination date of the current Collective Bargaining Agreement between my employer and the UFT, whichever occurs sooner.

The authorization and assignment shall continue in full force and effect for yearly periods beyond the irrevocable period set forth above and each subsequent yearly period shall be similarly irrevocable unless revoked by me within the 30 day period preceding expiration of such irrevocable period. Such revocation shall be effected by simultaneous written notice by registered or certified mail to my employer and the UFT which must be delivered within such 30 day period.

The assignment and authorization are effective at once.

Date _____

Employee Signature _____

# APPENDIX B

## Fact Sheet on the Investigation Process

The following steps are taken when an allegation of client abuse is made against an agency Employee.

1. An Incident Report Form is completed and submitted to the Program Director.

2. An Employee accused of client abuse will immediately be placed on administrative leave. This means suspended without pay. During the period of administrative leave, the Employee is not permitted on any agency property unless he/she receives prior approval from his/her Program Director.

3. The agency will assign a member of Management to investigate the allegation(s) of abuse. The investigator should not work at the site or be responsible for supervising the site of the Employee under investigation.

4. The investigator will explain to each Employee witness the reason behind the investigation. He/she will also inform each Employee witness that regulations and agency policy require them to cooperate in an investigation. Employees who refuse to cooperate in an agency investigation or sign a statement will be informed that they may face disciplinary action.

5. Interviews will be conducted in a place that provides privacy.

6. The investigator will interview potential witnesses, including staff and clients. He/she will also interview the affected client and staff member who was placed on administrative leave.

7. The investigator will take statements from witnesses, the affected client and the Employee being accused. Individuals who provide statements will be asked to read their statements or, if necessary, will have their statements read back to them, suggest any changes, and then sign them. These individuals are not entitled to and will not receive a copy of their statements.

8. Employees entitled to union representation, pursuant to their Weingarten Rights, may be accompanied by the representative during questioning.

9. The investigation is usually concluded within five working days of the date that the alleged abuse was reported to the Program Director.

10. Based on the results of this investigation, one of the following actions will be taken:
- If the charges are substantiated, the Employee will be terminated retroactive to his/her date of suspension and not entitled to any back pay.
- If the charges are false or inconclusive, the Employee will be reinstated with full back pay.
- In some cases where the results of an investigation are inconclusive, the affected Employee may be transferred to another program. This Employee will be reinstated with full back pay.

EEOC Form 161-B (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Shameekia Allen<br>85 Holland Avenue<br>Apartmenr #3-L<br>Staten Island, NY 10303 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|---|---|

| | On behalf of person(s) aggrieved whose identity is<br>*CONFIDENTIAL (29 CFR §1601.7(a))* |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2011-02226 | Corrado Gigante,<br>Acting Deputy Director | (212) 336-3665 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

| | | |
|---|---|---|
| [ ] | More than 180 days have passed since the filing of this charge. |
| [X] | Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge. |
| [X] | The EEOC is terminating its processing of this charge. |
| [ ] | The EEOC will continue to process this charge. |

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

| | |
|---|---|
| [ ] | The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost. |
| [ ] | The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time. |

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

Kevin J. Berry,
District Director

9/20/11

*(Date Mailed)*

cc: Allen Seiler
Director of Human Resources
United Cerebral Palsy
185 St. Marks Place
New York, NY 10301

Walter Harman, Esq.
200 West 57th Street
Suite 900
New York, NY 10019

UCP000042

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHAMEEKIA ALLEN, | |
|                     **Plaintiff,** | |
|   - against - | |
| UNITED CEREBRAL PALSY OF NEW YORK CITY and LOUELLA PURKETT, | |
|                   **Defendants.** | |

**Case No. 11 CV 8057 (CM)(KNF)**

<u>**NOTICE OF MOTION**</u>

       **PLEASE TAKE NOTICE**, that upon the Affidavit of Louella Purkett, with accompanying exhibits; Defendants' Rule 56.1 Statement; Defendants' Memorandum of Law, with Appendix of Exhibits; and upon all of the pleadings and prior proceedings herein, Defendants will move this Court before the Honorable Colleen McMahon at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007, on November 2, 2012 at 10:00 a.m., or as soon thereafter as counsel can be heard, for an order pursuant to Rule 56 of the Federal Rules of Civil Procedure granting Defendants partial summary judgment and dismissing Plaintiff's discrimination and hostile work environment claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the New York City Human Rights Law, New York City Administrative Code § 8-107, together with such other and further relief as may be just and proper.

       **PLEASE TAKE FURTHER NOTICE** that opposition papers, if any, are to be served upon the undersigned on or before October 26, 2012.

1

Dated: New York, New York
      October 5, 2012

**PUTNEY, TWOMBLY, HALL & HIRSON LLP**
*Attorneys for Defendants, United Cerebral Palsy of New York City, Inc. and Louella Purkett*

By:       _____/s/ SHC_____
          Sean H. Close
          Adriana S. Kosovych
          521 Fifth Avenue
          New York, New York 10175
          (212) 682-0020

TO:     Walker G. Harman, Jr., Esq.
       The Harman Firm, P.C.
       200 West 57th Street, Ste 900
       New York, New York 10019
       212-425-2600
       *Attorneys for Plaintiff*

# CERTIFICATE OF SERVICE

The undersigned, a member of the Bar of the State of New York, hereby certifies that she caused a true and accurate copy of the foregoing Notice of Motion, the Affidavit of Louella Purkett, with accompanying exhibits, Defendants' Rule 56.1 Statement, and Defendants' Memorandum of Law in Support of their Motion for Partial Summary Judgment, with Appendix of Exhibits, to be served on October 5, 2012 via ECF upon:

> Walker G. Harman, Jr., Esq.
> The Harman Firm, P.C.
> 200 West 57th Street, Ste 900
> New York, New York 10019
> 212-425-2600
> *Attorneys for Plaintiff*

_____
Adriana S. Kosovych

**Exhibit C**

# UNITED CEREBRAL PALSY JOB DESCRIPTION

| | |
|---|---|
| JOB TITLE: **Residence Program Specialist II** | DATE: 6/09 |
| PROGRAM: Residential Services | EXEMPTION STATUS: Non-Exempt |
| PAY GRADE: 6R | JOB CLASSIFICATION NUMBER: 422 |
| REPORTS TO: Residence Director & Residence Manager | |

## GENERAL SUMMARY:

Under general supervision, is responsible for devoting his/her attention to the care and development of the residents in one of the Agency's residential facilities. Interacts in a manner which fosters dignity and learning in a way that helps lead to greater independence. Helps create a homelike atmosphere for residents in an agency facility.

## MAJOR JOB DUTIES AND RESPONSIBILITIES:

- Provides care and assists with personal development and independence of residents.
- Ensures that all measures for safety and well being are maintained at highest level.
- Trains residents in activities of daily living and in development of self-help and social skills.
- Maintains a personalized, homelike atmosphere in residence facility.
- Attends weekly staff meetings as well as any other assigned meetings and in-service training.
- Prepares concise written reports including Incident Reports; Residents' Progress Notes and other reports as assigned.
- Responds to crisis situations and medical emergencies, including accidents by taking quick and decisive action.
- Ensures actions are conducted in a manner that prevents abuse and reports observations of co-workers who may be abusive in accordance with established procedures.
- Administers appropriate first aid based on visible symptoms and resident history in accordance with established guidelines and accepted first aid practices.
- Summons police, fire, ambulance or other emergency personnel if situation warrants it.
- If emergency has caused resident to exhibit behavior that is threatening or dangerous, in accordance with OMRDD approved Behavior Management guidelines, may have to restrain that resident.
- Takes residents to and from work, shopping, programs, restaurants, movies, doctor's appointments, etc.
- Assists with meal planning and preparation as well as with purchasing of food and supplies.
- Demonstrates an understanding of and implements behavioral programs.
- Participates fully as a member of interdisciplinary plan.
- Maintains an ongoing informal exchange of information. Maintains written logs for recording daily activities.
- Performs housekeeping, cooking, laundry, light maintenance and light preventative maintenance duties as needed in order to maintain a safe and homelike environment.
- Supervises any other activities as may be necessary in order to maintain quality of program.
- Dispenses prescribed medications to residents after successful completion of medication administration course and in line with Agency protocol. AMAP's are supervised by residence nurse in all areas related to medication administration.
- Completes all activities related to skill buildings as outlined in individual program plans.
- Attends to personal hygiene needs of residents i.e. toileting, bathing and changing as situation warrants.
- Handles all resident specific documents in a secure and confidential manner.
- Performs related duties as requested.

## MINIMUM EDUCATIONAL AND EXPERIENCE REQUIREMENTS:
- High School Diploma or GED.
- Six months of related experience is preferred but not required.

## LICENSE/CERTIFICATION:
- Within six months of date of being hired or transferring into this position, must be Approved Medication Administration Personnel (AMAP).

## SKILLS AND ABILITIES REQUIRED:
- Good oral and written communication skills
- Ability to read, write, speak and understand English
- Good interpersonal skills necessary to interact effectively with coworkers, employees, residents and their families.
- Ability to analyze problems and determine corrective measures

## PHYSICAL DEMANDS:
- Ability to lift, move and position adults or children in beds, wheelchairs, toilets, showers, vans, etc.
- Frequent stooping, bending, kneeling and pushing and pulling of heavy objects such as furniture and/or wheelchairs.

## WORKING CONDITIONS:
- Regular and routine exposure to a variety of unpleasant physical working conditions related to providing personal care assistance to residents i.e. toileting, changing diapers, etc.
- May be transferred to another job site and/or job title to meet Agency needs.
- Includes shift work which by prearrangement may include evenings, overnights, weekends and holidays.
- Occasional extension of shift to cover the health and safety needs of residents as emergencies and/or other situations warrant.
- May at times be required to work overtime.
- Need to take special precautions in the handling of body fluids.

## SIGNATURES:

Program Director _____     Date: 6/2/10

Human Resources _____     Date: _____

## EMPLOYEE ACKNOWLEDGEMENT:

I have read the foregoing Job Description for the position I hold at UCP/NYC and am aware of its contents.

X _Shaneekia Allen_____     _Shaneekia Allen_____     6/2/10
Employee Signature                 Employee Name                 Date

JD#147

**Exhibit D**

# Verbal Warning

Date: 7/24/10

To: Shameka Allen _____ for

- ☐ Lateness
- ☐ Did not document Goal(s) or Behavior(s) for _____
- ☐ Arguing with co-worker(s) (Misconduct)
- ☐ Do not do what management tells you to do (insubordination)
- ☐ Call out sick too much (Excessive call out)
- ☐ Absenteeism
- ☐ Left shift early
- ☐ Did not call about not reporting for work
- ☐ Poor Job Performance
- ☒ Misconduct — Taking NR to city without
- ☐ Insubordination — notifying management.
- ☐ Intoxication — S.A. reported she did not
- ☐ Dishonesty — have to with previous management.

Administered by: _____

**Exhibit E**

# Verbal Warning

Date: _8/19/10    6pm_

To: _Shameeka Allen_____ for

- ☐ Lateness
- ☐ Did not document Goal(s) or Behavior(s) for _____
- ☐ Arguing with co-worker(s) (Misconduct)
- ☐ Do not do what management tells you to do (insubordination)
- ☐ Call out sick too much (Excessive call out)
- ☐ Absenteeism
- ☐ Left shift early
- ☐ Did not call about not reporting for work
- ☑ Poor Job Performance   _Speaking about coworkers in front_
- ☒ Misconduct                     _of consumers, (2c) when asked_
- ☑ Insubordination             _to step outside apartment_
- ☐ Intoxication                    _became confrontational._
- ☐ Dishonesty                     _Spoke with Shameeka about_
                                            _inappropriateness of her actions._

Administrated by: _Jawellwos_____

**Exhibit F**

# Verbal Warning

Date: **9/9/10**

To: **Shameeka Allen** for

- [ ] Lateness
- [ ] Did not document Goal(s) or Behavior(s) for _____
- [ ] Arguing with co-worker(s) (Misconduct)
- [ ] Do not do what management tells you to do (insubordination)
- [ ] Call out sick too much (Excessive call out)
- [ ] Absenteeism
- [ ] Left shift early
- [ ] Did not call about not reporting for work
- [x] Poor Job Performance
- [x] Misconduct
- [x] Insubordination
- [ ] Intoxication
- [ ] Dishonesty

On 9/9/10, Shameeka was complaining + bad mouthing management team in front of her consumer. When questioned, she rolled her eyes and walked away (insubordinate)

Administered by: _Maria Travtino_

UCP000241

**Exhibit G**

# UCP/NYC DISCIPLINARY ACTION NOTICE FORM

**Employee Name:** Shameeka Allen _____     **Date:** 11/24/09 _____

**Job Title:** ___ On-Call Residential Program Specialist ___ **Program:** Castleton IRA ___

---

**Disciplinary action being taken (Please check one):**

| | | | |
|---|---|---|---|
| ☒ First Written Warning | | ☐ Suspension _____ days | |
| ☐ Second Written Warning | | ☐ Termination | |
| ☐ Final Warning | | | |

**This Disciplinary action is being taken for the following reason:**

| | | | |
|---|---|---|---|
| ☐ Absenteeism | | ☐ Left shift early | |
| ☐ Tardiness | | ☐ Did not call about not reporting for work | |
| ☐ Poor Job Performance | | ☒ Misconduct | |
| ☐ Insubordination | | ☐ Intoxication | |
| ☐ Dishonesty | | ☐ Client Abuse | |
| ☐ Other | | ☐ Violation of Agency rule (please specify) | |

---

**Please provide details of the infraction that occurred (Date, Time, Name(s) of individuals involved, witnesses, what happened, Where, Why and How):**

On November 22, 2009 Ms. Shameeka Allen was scheduled to go to the hospital, Richmond University Hospital due to Consumer hospitalization. Ms. Allen conducted herself unprofessionally (see attached statement from Nurse) The security in the hospital escorted her out the hospital due to her conduct.

Disciplinary Action   1

UCP000243

**Date of Previous Warning(s):** <u>Verbal Warning 8/16/2009</u>

**Administered By:**  Kashashi Buffong

---

**Please list the Corrective action(s) that must be taken:**

1. Ms. Allen must maintain good reputation and integrity of the organization at all times
2. She must conduct in a professional manner at all times.
3. Ms. Allen must have courtesy and cooperation towards visitors and co-workers.

This will serve as notice that any more infractions on your part may lead to further disciplinary action up to and including discharge.

---

I understand that my signature indicates only that this incident has been reviewed with me and does not indicate agreement or disagreement with the action taken.

Employee _____  Date  11-24-09

---

Supervisor _____  Date 11-24-09  Witness _____  Date 11/24/09

Assistant Executive Director _____  Date _____  Director, Human Resources _____  Date _____

☐ **Check if employee refused to sign**

---

**Please Note:** A copy of this form should be kept in the program's file, a copy given to the affected employee and the original sent to the Human Resources Department.

UCP000244

**Exhibit H**

# UCP/NYC EMPLOYEE SEPARATION RECORD

Employee Name: **Shameeka Allen**  SS# ▓▓▓▓▓▓▓▓

Program: **CASTLETON IRA**  Job Title: **RPS**

Date of Hire: **6/7/10**  Effective Date of Resignation/Termination: **9/15/10**

Please check one:  ☐ Resignation*  ☒ Termination  Last Day Worked: **9/15/10**

*If the employee resigned, please submit a copy of his/her resignation letter.

## REASON FOR SEPARATION:

**VOLUNTARY**
☐ Transportation Problems
☐ To look for other work
☐ Relocation
☐ Job Abandonment
☐ Health Related
☐ Maternity
☐ Returned to School
☐ Personal Reasons
☐ New Job
☐ Retirement
☐ Other (please list below)

**DISCHARGE**
☐ Absenteeism
☐ Tardiness
☒ Poor Job Performance
☐ Insubordination
☒ Misconduct
☐ Violation of Agency rules
☐ Falsified Employment Application
☐ Client Abuse
☐ Other (please list below)

**OTHER**
☐ Layoff
☐ Other (please list below)

If discharged: What was the final incident that led to the discharge?
Employee is currently on probation; after close review of personell file, continual misconduct, insubordination and poor job performance, the team has decided employee's services are no longer needed at UCP.

Were warning notices given? ☒ Yes ☐ No
Date **11/24/09** By Whom? **KASASHI BUFFONG** Reason **Misconduct** ☐ Verbal ☒ Written
Date **8/19/10** By Whom? **LOU PURKETT** Reason **Misconduct** ☒ Verbal ☐ Written
Date **9/9/10** By Whom? **MARIA TRANTINO** Reason **Misconduct** ☐ Verbal ☐ Written
Name of supervisor with first hand knowledge who can substantiate warnings and/or final incident:
**LOU PURKETT / MARIA TRANTINO**

Would employee be considered for rehire?  ☐ Yes ☒ No

Additional Comments: _____

_____

_____

Program Director  Date of this record **9/16/10**

UCP000006

# Exhibit I



**United Cerebral Palsy**
**of New York City**

Human Resources Department
80 Maiden Lane, 8th Floor
New York, NY
10038-4811
tel 212-683-6700
fax 212-545-0434
www.ucpnyc.org

September 15, 2010

Ms. Shameeka Allen
3240 Richmond Terrace
Apt# 2R
Staten Island, NY 10303

Dear Ms. Allen:

This letter is to inform you that effective immediately, your employment with UCP/NYC
has been terminated.


Sincerely yours,

Alan M. Seiler
Director Human Resources


cc:     L. Purkett

UCP000007